Whyte, Judge.
The plaintiffin error, was indicted in the circuit court of the county of Maury, for the murder of a negro man slave named Peter, the property of a certain David Jefferies: upon the indictment he pleaded not guilty. The Jury found him not guilty of the murder as charged in the bill of indictment, hut guilty of the manslaughter, in feloniously slaying the negro slave, Peter, Upon this verdict it was moved for the plaintiff in error by his counsel, that no judgment should be rendered against him, because the jury found him guilty of manslaughter only, which crime, where the person slain was a slave does not in point of law exist; the court overruled the motion in arrest ofjudgment, and passed sentence upon him, that he be burned in the brawn of the left hand, be imprisoned thirty days and pay the costs of the prosecution. From which judgment an appeal in the nature of a writ of error was taken to this court.
It was contended for the plaintiff in error, in a very able and learned argument, that the common law of England ought not to guide the investigation, and govern the de- *157 cisión of this question; for that slavery never existed in England, and therefore, the principles of the common law could not have in view, nor in any part be founded upon a state of society which had no existence in that country. That, although the colonial government of England or Great Britain, extended to these states before the revolution, yet the law of nations, on which slavery depended, and the municipal regulations Of each government on the subject, formed the code of laws, by which all questions regarding slaves should be governed: and therefore, the law of nations, with municipal regulations, or legislative acts of the colonial govfernments of North Carolina before the revolution, and the acts of assembly of North Carolina and Tennessee since the revolution, should govern this case. That by the law of nations, as it formerly existed, the master had an absolute and unlimited power over the life and fortune of his slave; that in later times municipal law has abridged this power of the master and produced amelioration in the state of slaves; but this melioration, or abridgment of the power of the master, is only co-extensive with the municipal assumption, leaving with him that portion not expressly taken away. From this view it follows, that the wilfully or maliciously killing, with malice aforethought, a negro or mulatto slave,being made murder, andthe offender punishable with death without benefit of clergy, by the act of 1799, ch. 9, does not include or embrace any other kind of homicide but the one mentioned; and the jury in the present case, having found the plaintiff in error guilty of manslaughter, being of a different and inferior grade to that stated in the act, is not an offence within it, and there being no other act of assembly, making a felonious and willful killing of a slave punishable, the judgment of the circuit court is erroneous.
We cannot concur with the view the learned counsel has taken of this case, and assent to the position, that the common law or its principles, are not to have an influence in the decision of this case. It is true, as observed in the argument, that pure and proper slavery never subsisted *158 in England, giving the master the power of life and death over the slave; but a species of slavery or servitude existed there from the earliest times; the subjects of it were not styled slaves, butvillains; and their state and circumstances much resembled that of our slaves, at the present day: These villains were either regardant, that is, annexed to the manor or land, or villains in gross or at large, that is, annexed to the person of the master, or lord, as he is called in the books. Both classes were transferable by deed from one owner to another, neither could leave their master without his permission; and if they ran a.way, or were purloined from him, might be claimed and recovered by action like beasts and other chattels. The children of villains were also in the same state of bondage with their parents, but followed the condition of their father, free if he was ffee, and villain if he was villain, differing in that respect with the condition of our slaves, when the maxim of the civil law, that partus sequitur ven-Irern prevails. Neither could the villain acquire properly for his own benefit, the maxim applying quicquid acquiretur servo, acquirelur domino, nor could he support an action a gainst his master for beating him, which privilege the master could always exert with impunity, as no civil remedy lay for him against his Lord. Such was the civil relation existing between the master and the villain at the common law. See 2 Bl. Com. 93, 94. Litt. S. 129, 194. Co. Lit. 117, a. But whilst the common law noticed and sanctioned these harsh characteristics of the villain’s condition, it guarded his person as an object of the criminal' law; and protected him against the atrocious injuries of his lord: for he might not kill or maim him, and for these he shall be indicted at the suit of the king. 2 Bl. Com. 94. 1 Inst. 116, b. Lit. s. 194.
This short review of the condition of villains at the common law, exhibits a strong resemblance to the condition of our slaves; the principal features of both are the same, and differing only in some minutia, which do not require to be noticed. Why then do not the principles of the common law apply, as far as the state or con- *159 dilion is similar, the one to the other. Our ancestors brought, upon their emigration, the common law with them as their rule of action, and still retain it where applicable; so it was, declared upon the first settlement of North Carolina, in the act of 1715, ch. 31, sec. 6, so also after the revolution in 1778 it is again declared “that all such parts of the common law as were heretofore in force and use within this territory, as are not destructive of, repugnant to, or inconsistent with the freedom or independence of this state, and the form of government therein established, and which have not been otherwise provided for, in the whole or in part not abrogated, repealed or expired, are hereby declared to be in full force in the state. Act of April 1778, ch. 5, sec. 2.
By the common law, murder, according to Lord Coleé, 3 Inst. 47, is “where'a person of sound mind and discretion, unlawfully killeth any reasonable creature, in being, and under the king’s peace, with malice aforethought either express or implied” — manslaughter; by Blackstone, (4 Com. 191,) is defined to be “the-unlawful killing of another, without malice either express or implied.” Both these definitions include the villain, and the negro or mulatto slave. Our act oí assembly of 1799, ch. 9, sec. 1, enacts, “that if any person shall wilfully and maliciously, with malice aforethought, kill any negro, or mulatto slave whatsoever, on due and legal conviction thereof, in any superior court of the district wherein such offence shall have been committed, be deemed guilty of murder, as if such person so killed had been a free man, and shall suffer death without benefit of' clergy, any law, usage or custom to the contrary notwithstanding.” This statute makes the same act murder, and punishable with death, which was so at the common law. If it is asked then, why was this statute made if the same act was murder and punishable with death at the common law. It was made in consequence of the prior act of 1774, having enacted, that the killing a slave under such circumstances, that would have constituted murder by a freeman doing so, should be punished only with 12 months imprison- *160 meat for the first offence. This act having so far super-ceded the common law on the same matter, the legislature willing it, in 1799, that this act of 1774, should be repealed and the common law be restored, instead of a repeal in terms, made an express provision on the same subject matter, operating as a repeal, and enacting that the killing, which by the act of 1774 was punishable only by 12 months imprisonment, should be punishable with death. It is now said that by these acts so much crime exists in our law as manslaughter, or the wilfully and fe-loniously lulling a slave, for that the municipal regulation of the country, or in other words, the acts of assembly do not in terms or otherwise declare its existence. It is answered, that the legislature in the acts of 1774 and 1799, legislated upon a set of facts constituting murder, and the act of 1784, says, when the subject of them is a slave, the punishment is 12 months imprisonment. Now if after the passage of 1784, it would be a correct construction to say, that as murder, which is a more heinous offence than manslaughter, is made only punishable by imprisonment for 12 months, therefore, the less offence of manslaughter does not exist, or if it does exist, is no,t punishable at all; would it not be an equally correct construction to say, that the repeal of this act of 1774, by the act of 1799, was a repeal of its imputed consequences and construction as well as of its express enactments. But the case is, that neither the act of 1774, or the act of 1799 speak of manslaughter, or the state of facts which constitute the offence of manslaughter in law. On the other hand it may be safely said, that if there is no act of assembly of North Carolina, or of the territorial government, or of our own government, the offence of manslaughter, when a negro or mulatto slave is the subject of it, from our criminal code, exists by the commonlaw: because it is the unlawful killing of a human being, and this definition of the of-fence is as well applicable to the negro or mulatto slave, as the villain.
We have already seen, that by the common law, the villain was protected as to his life and limb-., against the *161 atrocity of the lord or owner. This case, is that of a stl'an-ger committing the act, and not the lord or owner; this matters not, for the law is the same in both cases: if there were a difference by analogy to their civil rights, it would operate against the stranger. Thus, an action of assault and battery cannot he supported by the villain against his lord, for, being his servant ,he had a right to heat him at pleasure, not extending to life or member, hut to the like action by the villain versus non dominum, non valehit ei exceptio, quia est servus alienus, ex quo nihil ad ipsum, uirum liber sit non servus. If the being his servus, was a good an* swer by the lord, in an action of assault and battery, hut not available for him on indictment for homicide or mayhem, still less must he that of alienus servus in the mouth of a si ranger, upon the like indictment.
The judgment rendered in the present case is upon a verdict of the jury given on an indictment for murder, finding that the plaintiff in error is not guilty of the murder charged in the bill of indictment, but he is guilty of manslaughter in feloniously slaying the negro slave, Peter. Itis the same judgment that would have been rendered against the plaintiff in error, if the subject of the homicide had been a free man, instead of a negro slave. There is no law authorizing any distinction between the two cases. There was no distinction at common law between the judgments in homicide, for the killing a free man, and the killing a villain. The words of lord Coke are express to this point, he says “he that killed his villain, should have the same judgment as if he killed a free man.” 1 Inst. 116, b.
It may he also observed, that the finding of the jury in this case, is the usual finding upon a bill of indictment for murder, where the facts of the case admit of it, and is a proceeding at common law, and sanctioned by it. See I Blackstone Com. 48, where he says, “the common law, properly so called, is that law, by which proceedings and determinations in the King’s ordinary courts of justice, •are guided and directed.”
*162 Peck, judge.
Defendant was indicted in the circuit court of Maury county for the murder of a negro slave— he pleaded not guilty, and at the trial was found guilty of wilful and felonious slaying of the slave aforesaid.
The prisoner had his plea of clergy allowed, and judgment for the offence of manslaughter was pronounced against him; from which judgment he has prosecuted this writ oí error.
' It is now insisted that the wilful and felonious slaying of a slave is not punishable; and for this is cited 2 Haywood Rep.; 1 Taylor Rep.; act of 1799: for the State, 1 Hawk. Rep.
Murder, says Sir Edward Coke, 3 Inst. 47, is when a man of sound memory and of the age of discretion, unlawfully killeth, within .any county of the realm, any reasonable creature in rerum natura, under the king’s peace, with malice aforethought, either express or implied.
Blackstone, in his Commentaries, (4 vol. 194) remarks — • “at the crime of wilful and deliberate murder human nature starts with horror;” and which, says he, “is I believe, punished throughout the world with death.” The Mosaic law and the precepts to Noah are all so many denunciations against the crime. From remotest antiquity down to the present time, mankind in deliberating upon it, have formed the same opinion.
But it will be answered, none will disagree about the crime of murder. The question made is, whether or not the crime here found — that of slaying a slave — is a crime punishable by the laws of this state 1
Our act of assembly of 1799, ch. 9, provides, “that if , any person or persons shall wilfully or maliciously, with malice aforethought, kill any negro or mulatto slave whatever, on due and legal conviction, he shall be deemed guilty of murder, as if such person,so killed had been a freeman; and shall suffer death without benefit of clergy-”
This act, it is said, creates the offence and fixes the punishment for the murder of a slave; and it is not thence tobe inferred, that any other killing, not mentioned in *163 tlie act, was designed to be punished, er even considered as a crime. This argument is founded on what is said to be the law of nations — that captives taken in war are subject to be made slaves; and the captor has a right to dispose of the life of his captive, and for this Yattel is cited.
The position above assumed, I conceive is too broad. When a captive has laid down his arms and submitted, there is then no necessity for disposing of his life — and nothing but necessity or unavoidable accident, will excuse taking away life. If no necessity exists for destroying a captive human being, how can it be pretended the act can be excused; Yattel, 421.
Christian nations do not consider themselves at liberty to sport away the lives of captives. At this day the act would be reprobated and denounced as fit only for the savage state. Indeed, Christian example has greatly softened, in this respect, the ferocious savage in his wars.
It has been argued by a jurist, that the slave of this countrv, when taken in his own country, was subject to this law — that the dealer in the slave trade purchased the captive there with this burden attached to him; and hence it is that the law affords him no protection against the attempt of the master upon his life. That the law of a pagan or savage nation, should have been acquired with the commodity purchased and ferried over the wave with it, is a doctrine too monstrous for my mind; for had the slave on his passage touched in Britain, the common law would have protected his life against the assault of his master. That common law was in force in the colonies.
The attempt to impart and commix a principle so opposed to those founded in common law and suited to Christian communities, would be as futile as the attempt to unite oil with water. How can it be urged, that of necessity the horrors of slavery must not abate when introduced here, from the degraded condition it was found in where it had its origin. If it is true, as argued, that we •bring the law of the country with us — then a slave brought from those islands where it is said the captor *164 sometimes turns cannibal, kills and makes a repast of his cap(.jye — por p^e same reason, having the law and exam-pie of that country before us, it could be as safely followed here; and, ludicrous as this may seem, it falls exactly within the train of that argument, which can only be supported by supposing the slave on a footing with the live stock on a farm.
I have been taught that Christianity is part of the law of the land. The four gospels upon the clerk’s table admonish me it is so every time they are used in administering oaths. If the mild precepts of Christianity have had the effect to ameliorate the condition of this order of people, is it expected that we must recede from the improvement obtained — retire more into the dark, and become in government,partly Christian andpartly pagan, because we own pagans or savages for our property? If the argument on the other side is correct this consequence would follow. The whole train of thinking is erroneous; and it is not difficult to trace the origin of the error. Those in early time, concerned in the traffic of slaves, were unfeeling and' savage. The page of history proves that thousands fell victims to masters, some before and some after landing» Man is imitative. The cruelty first practis-ed was followed up, and a bad custom against all law was winked at. Butin later times, when murder did cry out, justice demanded her recompencc for crime; and some were ■ indicted — acts of assembly had been passed — and the offence having been so common, it was pretty natural to overlook the principle of the common law and follow such rules as were found in the statute; but common law, because of this oversight, had not ceased. It was regained, and greatly to the honor of the bench of N. Carolina.
.This statute of ours has not repealed the law as it stood before the passage of this act. It is much more sensible to say, it‘is affirmative of the common law — an attempt of the legislature to again bring into action w'hat courts had, unfortunately, but too long permitted to slumber.
*165 What is conclusive with me, that this is all that was intended, is the punishment inflicted by the act. For wilful and malicious murder, the offender is to suffer death without the benefit of clergy, — the former punishment. Say, that for a time the law, as it stood before, had been misconstrued or overlooked — if the court had revived and restored it to its pristine vigor, would not, in its restoration, the crime of manslaughter have been restored also? —Certainly it would.
If then the act is silent as to manslaughter, and there be no repeal of former laws, what pretence is there to say, that manslaughter is done away? I admit this will depend upon the question, whether the killing a slave with malice, was an offence at common law. But does not the common law definition cover the case? Is it the wilful and malicious killing of a reasonable creature? If he be such, then the reasoning is unsound and inconclusive , which offers as an excuse, that such reasonable creature is a slave. It is well said by one of the judges of N. Carolina, that the master has a right to exact the la-. bor of his slave — that far, the rights of the slave are suspended; but this gives the master no right over the life of the slave. I add to this saying of the judge, that law which says thou shalt not kill, protects the slave; and he is within its very letter. Law, reason, Christianity and common humanity, all point out one way.
Catron, Judge, concurred.
Judgment affirmed.