IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2022 Session

## STATE OF TENNESSEE v. BRANDON SCOTT DONALDSON

**Appeal from the Criminal Court for Knox County**
**No. 101256    Steven W. Sword, Judge**

---

### No. E2020-01561-CCA-R3-CD

---

Aggrieved of his Knox County Criminal Court jury convictions of second degree murder, the defendant, Brandon Scott Donaldson, appeals. He alleges error in the composition of the jury, arguing that the venire did not represent a fair cross-section of the community and that the State improperly used a peremptory challenge to strike an African American. He claims error in both the admission and exclusion of evidence, arguing that the trial court erred by admitting into evidence a sonogram photograph and by excluding text messages sent by the victim, certain of the victim's medical records, and prior consistent statements of a defense witness. He also asserts that the trial court erred by denying his motion for a mistrial after a State's witness offered improper testimony. He asserts that the prosecutor engaged in misconduct during closing argument. He claims error in the jury instructions provided by the trial court, arguing that the trial court incorrectly defined the offense of voluntary manslaughter and that the sequential jury instruction essentially barred the jury from adequately considering voluntary manslaughter as a lesser included offense of second degree murder. The defendant also challenges the sufficiency of the convicting evidence and the propriety of the total effective sentence. Finally, he asserts that the cumulative effect of the alleged errors prevented him from receiving a fair trial. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jonathan Harwell (on appeal and at trial) and Chloe Akers (at trial), Assistant District Public Defenders, for the appellant, Brandon Scott Donaldson.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen and Molly Martin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury charged the defendant with alternative counts of the first degree murder of Marcia Crider, alternative counts of the first degree murder of Ms. Crider's unborn child, the attempted first degree murder of Ms. Crider's mother, Pebbles Renee Jones,[1] and one count of employing a firearm during the commission of a dangerous felony related to the February 13, 2013 shooting death of Ms. Crider and her unborn child. Following a January 2015 jury trial, a Knox County Criminal Court Jury convicted the defendant of the second degree murder of Ms. Crider and her unborn child, the attempted second degree murder of Ms. Jones, and employing a firearm during the commission of a dangerous felony. The trial court imposed a total effective sentence of 68 years. The defendant appealed his convictions, and, on direct appeal, this court reversed his convictions based upon the trial court's erroneous exclusion of evidence and remanded the case for a new trial. *See State v. Brandon Scott Donaldson*, No. E2016-00262-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Knoxville, July 6, 2017).

*Summary of Facts*

The evidence adduced at the July 2018 retrial established that the defendant and Ms. Crider began dating in December 2012 after Ms. Crider ended her long-term relationship with Andre Crutchfield. At the time, Ms. Crider was pregnant with Mr. Crutchfield's child. Although Ms. Crider lived with Ms. Jones, she frequently spent the night at the Porter Avenue residence the defendant shared with Angela Knighton, a woman to whom he referred as his aunt. The defendant moved in with Ms. Knighton, who was legally blind, "a little less than a year" before the offenses.

The sometimes querulous relationship between the defendant and Ms. Crider reached a breaking point on February 13, 2013. On that day, the couple argued. Ms. Knighton awoke to Ms. Crider's "yelling very loud" and "calling him motherf*****s . . . and t[elling] him that he was a dirty dick, motherf*****, and that's the reason why his dick was burning, and she got her situation taken care of." Ms. Knighton also heard "like two smacks" and then the defendant's telling Ms. Crider "that she wasn't going to keep putting her hands on him too many times." The argument escalated, and Ms. Crider refused the defendant's appeals to leave. Ms. Crider took her belongings out of her bag as quickly as the defendant placed them in the bag. Ms. Knighton, who had walked to the defendant's room, then placed Ms. Crider's belongings in the bag and asked Ms. Crider to leave. The

---

[1] By the time of the retrial of this case, Ms. Jones had returned to using her maiden surname, which was Crider. Because Jones is the surname used in the indictment and to avoid confusion, we will refer to her as Ms. Jones throughout this opinion.

defendant lifted Ms. Crider and carried her into the living room and then tossed her bag into the yard. Ms. Crider, in turn, "put [her things] back in the bag and brought them back into [Ms. Knighton's] house." Ms. Crider warned the defendant that "she was going to call her uncles to have [the defendant] f***** up." The defendant left the Porter Avenue residence, leaving Ms. Knighton with Ms. Crider, who was "belligerent, just screaming, hollering, cursing." Ms. Knighton overheard Ms. Crider telephone the defendant and tell "him to bring her money back and that she was gonna have her uncles to f*** him up, to take care of him." Ms. Knighton telephoned the defendant to warn him "to be careful because she had somebody after him."

Ms. Crider telephoned Ms. Jones and reported that the defendant had "put his hands on her" and had taken the money Ms. Jones had given her to buy necessities for her child. After Ms. Crider relayed these allegations to her, Ms. Jones went to the Porter Avenue residence to pick up Ms. Crider. Ms. Jones also telephoned the defendant to chastise him for striking Ms. Crider and for taking her money. When Ms. Jones arrived at the residence, the defendant was not home, and Ms. Knighton let her inside. Ms. Crider gathered her belongings, and the two women were on their way out when they encountered the defendant, who was armed with a handgun. The defendant gave Ms. Jones $1,120 dollars, and Ms. Crider argued that he owed her another $80. When it appeared that the two would argue over the money, Ms. Jones hurried Ms. Crider outside with a promise to reimburse her for the $80. At that point, Ms. Crider "cocks her little head to the side, and she said, 'Hmm, I hope that $80 is worth the Sprite I poured in your shoes, huh.'" Ms. Knighton rushed into the bedroom and found that two pairs of the defendant's shoes "were full of liquids, clear liquids, Sprite" and that "all his clothes were bleached on the bed." The defendant, still armed, also hurried to his bedroom while the two women went to Ms. Jones's car.

As Ms. Jones drove away, the defendant came out of the Porter Avenue residence and fired his gun at Ms. Jones's vehicle. Although Ms. Jones initially believed that the women had gotten away unscathed, she soon realized that Ms. Crider had been shot. Ms. Jones pulled over and telephoned 9-1-1. Ms. Crider eventually succumbed to her injuries: two gunshot wounds, one of which entered the right side of the upper back then traveled through the right third rib, the right lung, the aorta and pulmonary trunk, and the left lung before coming to rest within her left breast and the other of which entered the left side of the lower back then traveled through the left side of the pelvis, penetrated her uterus, and passed through the head of her 13-week-old male fetus before coming to rest in her bladder. Two bullets were recovered from Ms. Crider's body, and two were recovered from Ms. Jones's vehicle. Forensic testing established that the bullets and the

11 cartridge casings recovered from near the Porter Avenue residence had been fired from the same gun.

The defendant disappeared immediately after the shooting, and because both Ms. Jones and Ms. Knighton knew him only by the nickname "L," it took authorities some time to ascertain his identity. A fingerprint obtained from ammunition discovered in the room where "L" had stayed at the Porter Avenue residence was matched to the defendant. The United States Marshals Service eventually located the defendant in Cook County, Illinois, on March 8, 2013.

The defendant admitted that on the day of the offenses, he had $1,200 that belonged to Ms. Crider and that they drove to meet friends of the defendant "on Catalpa." When one of the defendant's friends gave Ms. Crider a compliment, she "lashed out on" the friend "and called him . . . all type of names and just . . . went crazy on him." The defendant left before the situation could "escalate" and drove toward Ms. Jones's residence. Ms. Crider refused to get out of the car until the defendant took her to his house to retrieve her bag. Ms. Crider continued "bickering" with and yelling at the defendant with brief breaks for "[c]alling people on the phone, texting." The defendant said that he became so frustrated with Ms. Crider's behavior that he "turn[ed] the music up. Every time you get louder, I turn the music up louder, 'cause I don't want to talk to you." He eventually told Ms. Crider that it was time to end the relationship, which "made it worse." Ms. Crider "said, 'You're probably the motherf***er that gave me herpes,'" which shocked him and quickly escalated their argument.

Inside the Porter Avenue residence, Ms. Crider did not gather her belongings as promised but instead sat on the defendant's bed "and gets on the phone and starts calling people, starts texting people." She and the defendant continued to argue, and the defendant told Ms. Crider that she had to leave. Ms. Crider told the defendant that someone was coming to pick her up, which made him nervous because "I don't know who she's called on the phone. I know she's mad at me; and I know when people get mad, they do bad things sometimes." At that point, the defendant told Ms. Crider that he was taking her home and began packing her things. In response, "she went to the clothes rack in my room and was snatching stuff off my clothes rack and throwing it." When he went to clean up the mess, Ms. Crider began "pulling her stuff out the bag. I'm putting it back in the bag, and . . . this went on for . . . I don't even know how long." The defendant denied "slapping, punching, [or] choking" Ms. Crider but admitted that after Ms. Crider "took a swing at me," "I grabbed her" and "tried to pull her out of the room towards . . . the living room." He said that he "was gonna carry her outside," but "she dropped her weight and she fell to the floor," which made him realize "[t]hat wasn't the way to deal with it." The defendant

-4-

left the Porter Avenue residence at that point becaue he "needed some space . . . some time for myself."

After he left, Ms. Crider called the defendant several times and asked him "to bring her money." He told her that he would return her money if she would leave. Later, Ms. Jones called the defendant and asked about the money. The defendant told Ms. Jones that he would give Ms. Crider's money to Ms. Jones if Ms. Jones would "go and get her and take her somewhere" because he "just [did] not want to be around" Ms. Crider. The defendant told Ms. Jones that he "was going to stop and check on my things, 'cause when I left [Ms. Crider] was throwing my things around." He said that his "thinking at the time" was that he had Ms. Crider's money and that if she had destroyed his property, she was "gonna have to pay for them." He admitted that he was angry when he returned to the Porter Avenue residence but that "against my better judgment," he went into the house. The defendant testified that he "felt like I was going back into another argument" but that he felt there was "no way to prevent it, and I had to face it head on."

When the defendant walked inside the Porter Avenue residence, Ms. Crider "still was saying things to me, but I had made my mind up that I wasn't going to engage with her." Instead, he "came through the door and reached in my pocket, and I handed [Ms. Jones] the money." He recalled Ms. Crider's "saying something about" Sprite or his clothes "but that's not what . . . triggered me the most at that . . . particular time." Instead, it was Ms. Crider's comment that she knew where his mother lived and where he kept his money. He interpreted Ms. Crider's comment as "a serious threat" "against my whole family, 'cause my younger brothers were staying there. My mom was staying there." He added, "I was shocked that she would threaten me like that." At that point, the defendant "grabbed my gun, and I turned around . . . to approach them," but Ms. Knighton blocked his way. He said that he "felt like I was on autopilot. Like, I wasn't in control of myself. I felt like I was outside of my body watching myself." He pushed Ms. Knighton aside and "ran out of the house, and I ran towards the car." He "fired at the car" and then "panicked, and I ran, and I'm sorry."

The defendant "went and got a hotel room and stayed in the hotel room" instead of turning himself in to the police because he was "so scared. I was terrified. They were showing my picture, saying I'm armed and dangerous. I didn't know if they seen me out, if I tried to turn myself in, that they would shoot me." He said that he "was so upset with myself," particularly after learning that Ms. Crider had died, and that he "didn't have the tools to handle the situation properly." Eventually, the defendant left Knoxville and traveled to Illinois because he "couldn't breathe in Knoxville. I -- I couldn't sleep."

Based upon this evidence, the jury convicted the defendant as charged of the second degree murder of Ms. Crider and her unborn child but found the defendant not

guilty of the attempted second degree murder of Ms. Jones and employing a firearm during the commission of a dangerous felony. Following a sentencing hearing, the trial court imposed consecutive sentences of 25 years for the defendant's convictions of second degree murder. The defendant filed an unsuccessful motion for new trial followed by a timely notice of appeal.

In this timely appeal, the defendant challenges the composition of the jury, the trial court's rulings excluding certain evidence, the trial court's ruling admitting a sonogram photograph of Ms. Crider's unborn child, the trial court's denial of his motion for a mistrial, the propriety of the State's closing argument, the jury instructions for the offense of voluntary manslaughter, the sufficiency of the convicting evidence, the imposition of consecutive sentences, and the cumulative effect of the errors at trial. We consider each claim in turn.

## I. Jury Issues

"[J]ury selection in criminal cases . . . ordinarily consists of three phases." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019). During the first phase, "a group of citizens in the community is randomly summoned to the courthouse on a particular day for potential jury service." *Id.* In the second phase, "a subgroup of those prospective jurors is called into a particular courtroom for a specific case" and subjected to questioning "by the judge, as well as by the prosecutor and defense attorney" to determine which, if any, of the prospective jurors should be excused "based on their answers." *Id.* In the third phase, "the prosecutor and defense attorney may challenge certain prospective jurors" either "for cause, which usually stems from a potential juror's conflicts of interest or inability to be impartial" or by using "a set number of peremptory challenges or strikes," which "traditionally may be used to remove any potential juror for any reason—no questions asked." *Id.*

In this case, the defendant presents two challenges to the jury selection process in his case. First, he argues that the venire from which the petit jury was ultimately drawn did not represent a fair cross-section of Knox County. Second, he asserts that the State improperly exercised a peremptory challenge to dismiss an African American prospective juror.

## A. Fair Cross-Section

When the prospective jurors entered the courtroom, the defendant drew the court's attention to the fact that the 54-person venire contained only three people of color, two African Americans and one person of "Asian or Philippine extraction," and that, given the African American population of Knox County, he would have expected "four or five"

African Americans in a venire of that size. The defendant conceded that he had no "proof of intentional discrimination by any actor in terms of summonsing these people . . . pursuant to an apparently neutral procedure" but asserted that "we would all be blinding ourselves to the obvious to think that this is merely a statistical anomaly." He asked for a mistrial on grounds that the venire did not reflect a fair cross-section of the community. The trial court denied the motion.

The defendant exhibited to his amended motion for new trial information regarding the juror summonses issued in Knox County in April and July 2018, census data from that same time period, and demographic information gleaned from questionnaires completed by potential jurors during the jury orientation sessions. The reports indicated that in April 2018, a total of 1,400 juror summonses were sent. From this number, 228 summonses were returned by mail, 180 potential jurors were classified as "no show," 392 were excused for various statutory reasons, and 31 were disqualified. A total of 430 potential jurors responded to a questionnaire. Of those who completed the questionnaire, 5.14 percent reported their race as "Black or African American." For July 2018, a total of 1,600 jury summonses were issued. Some 261 of those were returned by mail, 339 were designated as "no show," 432 were excused from jury service, and 92 were disqualified. A total of 509 potential jurors responded to a questionnaire in July. Of those who completed the questionnaire, 6.32 percent reported their race as "Black or African American."

The defendant also exhibited to his motion an affidavit from Matthew Vogel, Associate Professor of Criminal Justice at the University of Albany. In his affidavit, Doctor Vogel stated that he had reviewed the information that the defendant had exhibited to his motion and that he had concluded that the percentage of African Americans in the venire was 3.7 percent, that the percentage of African Americans among the 428 people who revealed their race in April was 5.1 percent, and that the percentage of African Americans among the 506 people who revealed their race in July was 6.3 percent. Doctor Vogel determined that the absolute disparity between the jury-eligible African American population of 8.32 percent and the percentage ultimately represented in the venire was 4.62 percent and that the comparative disparity between the two was 55.5 percent. Doctor Vogel then utilized a formula to determine that "it is unlikely that the observed disparities in the jury orientations reflect a random process. Instead, all three measures point to the systematic exclusion of Blacks and African American jurors in Knox County." He added, however, "On the other hand, approximately 1 out of every 10 venires of 54 jurors would have an absolute disparity of 4.62 or less, suggesting that this disparity could be attributed to a random process."

At the hearing on the defendant's motion for new trial, Knox County Criminal Court Clerk Michael Hammond testified that his office "assists the . . . jury

coordinator" with issuing summonses to potential jurors. Mr. Hammond said that he began working with information technology personnel in 2016 to institute procedures that would ensure "that we had proper jury pools." Mr. Hammond said that, during this process, he had been assured "that the random selection of the jurors and the summonses were being done properly." Mr. Hammond testified that he continued "spot-checking and looking at when the summonses go out to make sure that we are meeting those guidelines." He said that Knox County utilized an entirely automated jury selection system and that once the individuals summonsed responded to the "cattle call," they were asked to "voluntarily fill out a questionnaire" that asked for demographic information. Mr. Hammond said that the clerk's office used the information gleaned from the questionnaire "for our own internal purposes just to see the makeup of the jury pool." He explained that, because participation was completely voluntary and because no attempt was made to verify the information reported, he did not consider the questionnaire "scientific" but "more of a[n] internal document for our purposes to see the makeup of the people who actually came to the jury orientation."

Mr. Hammond testified that the information revealed in the jury questionnaires from April and July 2018 did not accurately and completely reflect the pool of potential jurors summonsed. Instead, the questionnaires represented "only the people who actually showed up at the orientation and who voluntarily chose to fill out that survey." Mr. Hammond said that when the summonses were sent, officials did not know the race or gender of the individuals to whom they were issued.

He explained that his office had a method to go back and examine the makeup of the jurors selected and that he had done so for the entire year of 2018 in response to the defendant's challenge. At that time, the African American population made up 8.9 percent of the population of Knox County, and the percentage of African Americans summonsed for jury duty ranged from 8.3 to 10.4 percent. He said that if a particular pool failed to accurately reflect the percentage of any particular group, "[w]e would probably just take that and void it." Mr. Hammond testified that since he began cross-checking the numbers, he had not had to void any pool.

Mr. Hammond testified that, in preparation for the hearing, he had examined the jury panel called for the defendant's case "to determine which batch" of summonses "they would have come from." He then "went back and looked at the batches" to determine that the percentage of African Americans included in those batches averaged 9.02 percent.

During cross-examination, Mr. Hammond testified that Knox County conducted its jury selection process pursuant to statute using information from the Department of Safety that was updated every two years. After 1,400 individuals were randomly selected using the data, the clerk's office sent the addresses "to an offsite

company who does USPS address verification." Juror summonses were sent via first class mail to prospective jurors at the verified addresses. He said that only jurors who "submitted a doctor's excuse, if there was a medical reason as to why they could not" serve would be permitted to skip the juror orientation event. His office kept a record of those submitting medical excuses. The juror orientation event was held at The Expo Center, which, he said, was five to 10 minutes from downtown Knoxville. He said that, to his knowledge, no potential juror had contacted the office to say that they did not have transportation to get to the event. He estimated that 60 to 70 percent of the original 1,400 individuals summonsed would actually attend the orientation event. He said that his office kept track of those individuals who did not attend but did not do anything with that information aside from sending out follow-up letters asking them to contact the clerk's office.

Mr. Hammond testified that, at the orientation event, jurors were given a time frame within which they would be on call to report for jury duty if their panel was called. Potential jurors who did not report when their panel was called would be reported to the trial judge, who would then be responsible for determining how to proceed. He said that, typically, the clerk's office would call the individual and find out why they did not report. They would report any response to the judge. He said that, in his experience, "90 to 95 percent, if not 100 percent" of potential jurors assigned to panels reported as required. He added, "We have very few no-shows."

Kasey Wenger Stone testified that she was the criminal court jury coordinator and that she had previously worked as an assistant to the previous jury coordinator. She testified that the jury pool in the defendant's case was selected from "six different summons" and that the percentage of African Americans summonsed for those six batches was 9.02 percent. She said that the clerk's office could determine the demographic composition of the potential jurors who report for service at any given time but that they "don't track that because we've taken care of that in the front end" by ensuring that the correct percentage of members from each distinctive group is represented in the number of summonses sent out. She said that the clerk's office did not "have power or control over who actually participates or contacts our office" after the summonses were issued.

The defendant agreed that the clerk's office had followed the statutory procedures and had "gone above and beyond" to try and ensure that summonses were sent to a fair cross-section of the community. He argued, however, that "something" was happening "in between jury summonses going out" and individuals actually reporting for the juror orientation sessions. He theorized that "maybe there's a disproportionate percentage of African Americans who move around" or that "maybe there's a disproportionate percentage of African Americans who just don't respond and realize nothing ever happens to them." He asserted that these issues were nevertheless "part of the system" and that the defendant did not bear the "burden to explain how to fix it." The

trial court concluded that the clerk's office had utilized a constitutionally appropriate jury selection procedure.  The court found that "it was a fair cross-section."

On appeal, the defendant reiterates his claim that he was denied the constitutional right to trial by a jury selected from a fair cross-section of the community. The State contends that the defendant has failed to establish a prima facie violation of the fair cross-section requirement.

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)).  "[T]o establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement," the defendant

> must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Berghuis*, 559 U.S. at 319 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).  As the Court observed, "[t]he first showing is, in most cases, easily made; the second and third are more likely to generate controversy." *Berghuis*, 559 U.S. at 319.  The Court has not "specifie[d] the method or test courts must use to measure the representation of distinctive groups in jury pools" but has identified three "imperfect" methods either "employed or identified" in lower federal court decisions: absolute disparity, comparative disparity, and standard deviation.  *Id.* at 329 (citation omitted).  "Absolute disparity" is calculated by subtracting the percentage of members of the allegedly excluded group in the jury pool from the percentage of members of the same group "in the local, jury-eligible population." "Comparative disparity" is calculated "by dividing the absolute disparity . . . by the group's representation in the jury-eligible population."  *Id.* at 323.  "Standard deviation analysis seeks to determine the probability that the disparity between a group's jury-eligible population and the group's percentage in the qualified jury pool is attributable to random chance."  *Id.* at 324 n.1.  Our supreme court found "much to agree with in the approach adopted by the Michigan Supreme Court and referenced in *Berghuis*" and adopted the same "case-by-case approach" utilized by the Michigan Supreme Court: "Provided that the parties proffer sufficient evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable." *State v. Hester*, 324 S.W.3d 1, 43 (Tenn. 2010) (quoting *People v. Smith*, 615 N.W.2d 1, 3 (2000)).

Here, the defendant presented evidence, uncontested by the State, that the difference between the percentage of jury-eligible African American residents in Knox County and the percentage of African Americans contained in the jury pool from which the jury was selected created an absolute disparity of 4.62 percent and a comparitive disparity of 55.5 percent. The record establishes that juror summonses were sent to a number of African Americans that represented a percentage equal to or greater than the total percentage of jury-eligible African American residents. It is true that, based upon the information gleaned from the jury questionnaires in April and July 2018, the percentage of African Americans that attended the juror orientation events was much lower. The record establishes, however, that not every potential juror who attended the event completed the voluntary questionnaire and that not every person who completed the questionnaire answered the question about race. It is also true that the percentage of African Americans represented on the actual venire from which the defendant's jury was chosen was far below the percentage of jury-eligible African Americans in Knox County. Using this evidence, the defendant certainly established that African Americans are a distinct group and arguably established that African Americans were underrepresented in the jury pool. As the Supreme Court has observed, however, these factors are generally the most easily established.

We turn then to the third factor, whether the underrepresentation was attributable to the systematic exclusion of the group in the jury-selection process. On this point, the defendant asserts that he bears no burden of proof, arguing that he is not required "to explain the exact reasons for this problem." On this point, he is, quite simply, wrong. "No 'clearly established' precedent of this Court supports [a] claim that [the defendant] can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, might contribute to a group's underrepresentation." *Berghuis*, 559 U.S. at 332. In *Berghuis*, the Court specifically rejected the argument that *Duren* "placed the burden of proving causation on the State." *Id.* Instead, the Court said, the defendant must identify a particular practice and must prove that the practice has caused systematic underrepresentation. *Id.*; *see also, e.g.*, *State v. Lilly*, 930 N.W.2d 293, 307-08 (Iowa 2019). The defendant does not actually suggest any particular practice that resulted in the systematic exclusion of African American jurors during the jury-selection process utilized in Knox County. Instead, he suggests that, because the standard deviation was greater than that that could be explained by chance, "there is something inherent in the jury selection system that produces this flawed outcome. It is thus, by definition, 'systematic.'" His own expert, however, indicated that "approximately 1 out of every 10 venires of 54 jurors would have an absolute disparity of 4.62 or less, suggesting that this dispartiy could be attributed to chance." Moreover, because the demographic information from the questionnaires represented only those who agreed to fill them out and not the entirety of persons who appeared for juror orientation, the relevance of the information is suspect. The defendant

-11-

points to a number of social and economic issues that might explain the underrepresentation of African American jurors, but those courts that have considered the issue have determined that such factors are only relevant to the extent that the jury selection system makes them so.

The defendant relies heavily on *Duren*, but the proof he presented in this case differs from that presented by Duren in both quantity and quality. At issue in *Duren* were "provisions of Missouri law granting women who so request an automatic exemption from jury service." *Duren v. Missouri*, 439 U.S. 357, 360 (1979). Duren presented specific evidence that women were grossly underrepresented in "every venire for nearly a year" and that the underrepresentation could be tied directly to the structure of the exemption for women, which not only allowed women to be exempted from jury duty solely on the basis of gender but also presumed that any woman who did not respond to a jury summons had chosen to exercise the exemption. *See Duren*, 439 U.S. at 366. Duren demonstrated "that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year," indicating "that the cause of the underrepresentation was systematic— that is, inherent in the particular jury-selection process utilized," which allowed Duren to show "that the underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria—whether the automatic exemption for women or other statutory exemptions—as implemented in Jackson County." *Id.*

Here, the defendant presented statistical evidence only from the juror summonses sent in April and July 2018. Although he did present the affidavit of another criminal defense attorney who asserted that he could not recall having participated in a trial in which "more than 2 or 3" African Americans appeared in the venire, this evidence fell far short of that presented by Duren. Additionally, and perhaps more importantly, the defendant pointed to no specific part of the system to which the discrepancy could be attributed. This case is not like *Duren*, where Duren obtained relief because he "demonstrated systematic exclusion with particularity" by showing "that women's underrepresentation was persistent" and by identifying "the two stages of the jury-selection process 'when . . . the systematic exclusion took place.'" *Berghuis*, 559 U.S. at 328 (quoting *Duren*, 439 U.S. at 366). The evidence presented by the defendant established that a variety of race-neutral exemptions were utilized by a total of 824 potential jurors, in contrast to *Duren*, where an essentially automatic exemption for women specifically accounted for the underrepresentation of women.

Moreover, in *Berghuis v. Smith*, the Supreme Court examined Smith's "list" of potential reasons for underrepresentation, which "include[d] the County's practice of excusing people who merely alleged hardship or simply failed to show up for jury service, its reliance on mail notices, its failure to follow up on nonresponses, its use of residential addresses at least 15 months old, and the refusal of Kent County police to enforce court

orders for the appearance of prospective jurors," and found that Smith had failed to demonstrate systematic exclusion of African Americans. *Berghuis*, 559 U.S. at 332. Smith's list, rejected by the Court, looks strikingly similar to the reasons cited by the defendant as possible reasons for the winnowing of African Americans from the jury pool, including the use of "driver's license data that is updated only every two years," the association of transience with lower income "and the percentage of African Americans who are lower-income [being] greater than the population in general," the lack of access to the juror orientation sessions and to trial, "the historic legacy of the justice system in the South," and "the fact that the system takes no steps to track down or compel jurors to show up if they do not respond to their summons." As the Court observed, it had never held that a defendant could "make out a prima facie case merely by pointing to a host of factors that, individually or in combination, might contribute to a group's underrepresentation" and had "never 'clearly established' that jury-selection-process features of the kind on Smith's list can give rise to a fair-cross-section claim." *Berghuis*, 559 U.S. at 332-33. The State is not required to establish a perfect selection system or to create venires that directly mirror the population every single time. It is enough that the selection process does not systematically exclude African Americans.

We conclude that the defendant has failed to establish a prima facie violation of the fair cross-section requirement.

## B. *Batson v. Kentucky*

The defendant also argues that the State improperly utilized a peremptory challenge to excuse the only African American from the venire and that the State failed to establish a race-neutral reason for doing so. The State asserts that the prosecutor provided race-neutral reasons for excusing the juror in question.

The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). "A prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at the outset of the proceedings" that "casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause." *Powers v. Ohio*, 499 U.S. 400, 412-13 (1991). An accused can "establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges." *Batson v. Kentucky*, 476 U.S. 79, 96 (1986). "Under *Batson*, once a prima facie case of discrimination has been shown by a defendant, the State must provide race-neutral reasons for its peremptory strikes. The trial judge must consider the State's proffered reasons "in light of all of the relevant facts and circumstances, and in light of the arguments of the parties" and "determine whether the prosecutor's stated reasons were the actual reasons or

instead were a pretext for discrimination." *Flowers,* 139 S. Ct. at 2241 (citation omitted). Case law permits "criminal defendants raising *Batson* challenges to present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race" including:

> • statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
>
> • side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
>
> • a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
>
> • relevant history of the State's peremptory strikes in past cases; or
>
> • other relevant circumstances that bear upon the issue of racial discrimination.

*Id.* at 2243.

On appeal, the reviewing court is "highly deferential" to "the trial court's factual determinations in a *Batson* hearing," which "largely will turn on evaluation of credibility." *Id.* (citation omitted). "[A] trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Id.* at 2244 (citation omitted).

Here, during the first round of peremptory strikes, the State excused the only African American prospective juror to be seated in the jury box. The trial court asked the State "to be on the safe side," to "put a race-neutral reason on the record on why you're striking" Prospective Juror F. The prosecutor replied:

> Several, judge. First off, he mumbles when he speaks. I couldn't understand clearly the responses that he was giving. He -- on several instances, he was scowling during . . . my portion, and then when [defense counsel] got up, he started

-14-

nodding significantly when she first started hers. He looks like he's having trouble hearing, 'cause he's putting his hand to his ear on several occasions, and he -- and I thought initially the scowling was because he may have vision problems, and I see he . . . has now put on sunglasses. And I think that . . . his voice trails off when he's speaking. It's because of the mumbling. It happened to both [defense counsel] and myself where we continued onto another person, and he continued to speak.

The trial court agreed that Prospective Juror F was "scowling at" the prosecutor and found that to be "a race-neutral reason."

After the jury was seated but before the trial began, the defendant again objected to the State's striking Prospective Juror F, asserting that the State's purportedly race-neutral reasons for the strike were pretextual. He argued that the State could not rely on Prospective Juror F's alleged trouble seeing and hearing because the State did not "take the obvious step of asking do you have this problem." As to the prosecutor's complaint of the prospective juror's "mumbling," the defendant stated that mumbling did not suggest that someone could not be a fair juror. The State defended the proffered reasons, claiming again that Prospective Juror F "was nodding with approval when [defense counsel] got up there, and he was scowling . . . noticeably, to me, Judge, at least, when I was talking during my portion of voir dire." The prosecutor argued that "mumbling obviously would" impact the ability to "communicate effectively with other jurors during deliberations."

The trial court again concluded that "they are race neutral reasons." The court described Prospective Juror F as a "very unique individual" who "did have a very different demeanor that goes well beyond his cultural heritage or his skin that I thought stood out to me." The court said it "was joking when I said he was scowling at you" and that "he just always looked kind of like he had that look on his face, to me, but you were watching probably more closely than I was."

We begin with the defendant's assertion that the trial court impermissibly manufactured a race-neutral reason for the striking of Prospective Juror F instead of simply evaluating those offered by the State. Although the exercise of peremptory challenges "are often the subjects of instinct" and although "it can sometimes be hard to say what the reason is," "when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). "A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a [race-neutral] reason." *Id.* Stated differently, the mere "substitution of a reason for

-15-

eliminating [a prospective juror] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions." *Id.* In consequence, the trial court's observation that Prospective Juror F was a "very unique individual" who "did have a very different demeanor that goes well beyond his cultural heritage or his skin," could not have satisfied the requirement of a race-neutral reason for the State's striking him.

We turn then to the reasons actually offered by the State. The prosecutor indicated that he believed, based upon some of his physical actions, that Prospective Juror F struggled with hearing and vision issues. The record reflects, however, that the State did not ask the prospective juror if he had any issues with his hearing or vision that might impact his ability to act as a juror in the defendant's case. "[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El*, 545 U.S. at 246 (quoting *Ex parte Travis*, 776 So. 2d 874, 881 (Ala. 2000)); *see also State v. Robert A. Franklin*, No. E2017-00334-CCA-R3-CD, 2018 WL 3998766, at *29 (Tenn. Crim. App., Knoxville, Aug. 21, 2018) (recognizing "that a prosecutor's failure to ask additional questions on a topic of concern can suggest that the prosecution's race-neutral explanation is merely pretextual"). Although physical infirmaties such as problems with vision or hearing could certainly be race-neutral reasons for striking a juror, the record does not contain any evidence to support the prosecutor's statements about Prospective Juror F's vision and hearing because the State did not ask the juror any questions about those issues.

We are left then, with the prosecutor's assertion that Prospective Juror F was "scowling" during the State's portion of voir dire and nodding in agreement during the defendant's portion. "Although non-verbal communication, such as demeanor or inattentive behavior, can form a race-neutral basis for a peremptory strike, we recognize that race-neutral explanations based on subjective assessments 'must be carefully scrutinized.'" *Robert A. Franklin*, 2018 WL 3998766, at *30 (quoting *State v. Carroll*, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000)). When the State relies on a prospective juror's demeanor as a race-neutral reason for exercising a peremptory strike, "the judge should take into account, among other things, any observations of the juror that the judge was able to make during the voir dire," but "a demeanor-based explanation" need not "be rejected if the judge did not observe or cannot recall the juror's demeanor." *Thaler v. Haynes*, 559 U.S. 43, 48 (2010). Indeed, deference to the ruling of the trial court "is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." *Snyder*, 552 U.S. at 479.

Here, the trial judge initially agreed with the State's assertion that Prospective Juror F had been scowling at the prosecutor but later indicated that it had only been "joking" and observed that what the prosecutor believed to be a scowl might simply

have been the prospective juror's default expression. The court acknowledged, however, that it had not observed the jurors as closely as the prosecutor and did not dispute the prosecutor's account. To be sure, a prospective juror's body language communicating an inclination to favor or disfavor one side over the other is an acceptable race-neutral reason for striking the juror. Consequently, it is our view that the ruling of the trial court that the State had offered a race-neutral reason for striking Prospective Juror F was not clearly erroneous. The defendant is not entiled to relief on this issue.

## II. Exclusion of Evidence

The defendant asserts that the trial court erred by excluding from evidence testimony and text messages that suggested that Ms. Crider was soliciting someone to rob the defendant or his family, medical records detailing Ms. Crider's diagnosis and treatment "for a variety of STD's" in the months preceding the offenses, and the prior consistent statement of a witness, all of which, he argues, would have served to corroborate other defense evidence. The trial court excluded the evidence on grounds that it constituted inadmissible hearsay. The State contends that the trial court did not err.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Our supreme court has confirmed that "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

The defendant also argues that his constitutional right to present a defense

-17-

trumps the application of the rules of evidence with regard to the challenged evidence. Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits, *see Flood*, 219 S.W.3d at 316 (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence[.]" *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-45; *State v. Rice*, 184 S.W.3d 646, 673 (2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

### A. Ms. Crider's Threats

The defendant asked the court to allow Ms. Knighton to testify "that in that same time period" Ms. Knighton heard Ms. Crider "make phone calls to individuals, asking them to come and help." He argued that the evidence was necessary "to show the full picture" and that the testimony "can't be hearsay" because it was Ms. Crider's "asking someone to do something." The trial court disagreed, ruling that the testimony constituted inadmissible hearsay.

The defendant made the following offer of proof on the record:

Q      And you also heard her make calls to someone else -- in which she was asking them to come F-up "L"; is that right?

-18-

A       Yes.

Q       And when those calls were made, you were in the room with her, right next to her?

A       I was.

Even after the proffer, the trial court maintained that the evidence was inadmissible.

The defendant also sought the introduction of text messages sent and received and telephone calls placed by Ms. Crider before her death on the day of the offenses. The text messages had been gathered during the forensic examination of her cellular telephone by the KPD. The defendant argued that the evidence "would be relevant absolutely to a state of passion produced by provocation defense." The defendant also asked the trial court to admit the text messages and telephone calls to corroborate Ms. Knighton's testimony, saying that "looking at these records absolutely bolsters the idea that [Ms.] Knighton is being completely truthful when she is saying that [Ms. Crider] is telling [the defendant] that she's going to have something done to him." The defendant also argued that the State's failure to fully investigate the text messages could "cast doubt on the validity of the investigation." The trial court sustained the State's objection, ruling that "these text messages are hearsay. They weren't made to the defendant, and so I'm gonna exclude them."

At the defendant's first trial, the trial court excluded testimony from Ms. Knighton regarding the victim's telephone conversations and alleged threats against the defendant, and this court determined that "such statements were not erroneously excluded." *Brandon Scott Donaldson*, slip op. at 12. As she did at the first trial, Ms. Knighton confirmed that the defendant was gone when Ms. Knighton overheard Ms. Crider make the threatening statements about the defendant and that she did not communicate the specific information to the defendant. As we explained in our earlier opinion, because the defendant was not aware of the specific contents of the information that Ms. Knighton overheard, it could not serve as a basis for finding that Ms. Crider had provoked the defendant and, consequently, "it could only have been offered for its truth." *Id.* Consequently, Ms. Knighton's testimony was inadmissible hearsay.

As indicated above, the defendant tried a new tactic to gain admission of the evidence, arguing that it was admissible to corroborate other testimony by Ms. Knighton and testimony from the defendant, who did not testify at the first trial. The text messages and the conversations overheard by Ms. Knighton were, unquestionably, hearsay. No exception supports their admission into evidence, and the defendant does not argue otherwise. That the evidence might have bolstered the credibility of the defense witnesses

does not alter its character. Indeed, because the purpose for offering the evidence was to enhance the veracity of the testimony offered by the defense, it was necessarily offered for the truth of the matter asserted. If it was not true, then it could not bolster credibility. Because the defendant did not know about the specific threats conveyed in the text messages and telephone calls, they were irrelevant. Moreover, in contrast to the first trial, the defendant testified at the second trial and told the jury that Ms. Crider had threatened to harm him and his family. Additionally, in contrast to the second trial, Ms. Knighton was permitted to testify about the statements that she heard Ms. Crider make to the defendant about sexually transmitted disease and was permitted to testify that she telephoned the defendant to warn him "to be careful because [Ms. Crider] had somebody after him." In light of this additional evidence and because the defendant was unaware of the threats, when viewed under the criteria set forth in *Flood*, we cannot say that the substance of Ms. Crider's text messages and telephone calls was critical to the defense. Consequently, the trial court did not err by excluding it.

In a related issue, the defendant wanted to introduce Mr. Crutchfield's previous testimony about the text messages and telephone calls he exchanged with Ms. Crider on the day of the offenses. The defendant asked the trial court to find Mr. Crutchfield legally unavailable as a witness because they had been unable to serve him with a subpoena. The State objected on hearsay grounds.

The trial court found that Mr. Crutchfield was legally unavailable but determined that "parts of the transcript" were "inadmissible in this trial." The court specifically ruled that "all the stuff about her asking him to come to Knoxville and to do anything, anything she's saying to him, I think is inadmissible hearsay, even though he's unavailable as a witness."

Mr. Crutchfield's prior testimony was hearsay, and his prior testimony about the messages and calls he exchanged with Ms. Crider was hearsay within hearsay. At the first trial, the State called Mr. Crutchfield as a witness, and he was permitted to testify about the messages not because they were not hearsay but because the defendant did not object to their admission. They were hearsay then, and they are hearsay now. Indeed, the defendant does not actually posit an exception to the hearsay rule that would permit the admission of the excluded testimony but argues instead that the information should have been admitted under the criteria in *Flood* because it was critical to his defense, again asserting that its purpose would have been to corroborate the defendant's testimony that Ms. Crider had threatened him. As we explained above, however, the defendant was unaware of Ms. Crider's conversations with Mr. Crutchfield, and the State did not argue that Ms. Crider did not threaten the defendant. As a result, Mr. Crutchfield's testimony does not satisfy the criteria for admission under *Flood*.

## B. Medical Records

The defendant asked the trial court to permit him to admit "medical records that are consistent with" Ms. Crider's having been treated for two sexually transmitted diseases, which evidence he argued was relevant to corroborate Ms. Knighton's testimony that she overheard Ms. Crider tell the defendant that she knew why his "dick was burning" and that she had gotten her own "situation taken care of." The court found that the reason the original statement came in was because "it's not offered to prove the truth of the matter asserted. Now you're trying to bring in proof to show it was true, and I think that's inadmissible." The court said that even if the records themselves were admissible via an exception to the hearsay rule, if the court allowed the records to be admitted, their admission "removes the justification for the original statement being brought in, in the first place."

In the defendant's first appeal, we concluded that "Ms. Knighton's testimony regarding the victim's statements to the defendant about giving him a venereal disease was clearly not offered to prove the truth of the matter asserted; rather, these statements were offered to show the potential effect on the listener, *i.e.*, the defendant." *Brandon Scott Donaldson*, slip op. at 12. Thus, we concluded that "[b]ecause these out-of-court statements of the victim's were not offered for their truth, they did not qualify as hearsay, and the trial court erred by excluding them on that basis." *Id.* During the retrial, the defendant sought to not only admit Ms. Knighton's testimony on grounds that it was not offered for its truth but also to prove that Ms. Crider's statements were true. Whether the statements were true or not was irrelevant. The only relevance came from their effect on the defendant. Consequently, regardless of whether Ms. Crider's medical records might have been admissible under an exception to the hearsay rule, they remained inadmissible because they were irrelevant. *See* Tenn. R. Evid. 401, 402.

## C. Other Statements Overheard by Ms. Knighton

During Ms. Knighton's direct examination testimony, the defendant asked Ms. Knighton whether she had overheard Ms. Crider make a telephone call just after the defendant left the Porter Avenue residence. When the defendant asked about the substance of that conversation, the State objected on hearsay grounds. The defendant argued that Ms. Knighton would testify that she overheard Ms. Crider tell Ms. Jones that the defendant had hit her and injured her to a degree that she needed an ambulance and that Ms. Knighton attempted to "yell through the phone, 'No, he didn't. He did not hurt her.'" He argued that the evidence was relevant to establish that Ms. Crider was behaving in a provocative manner and "engaging in a set of manipulations." The trial court deemed the evidence inadmissible. The defendant made the following offer of proof:

-21-

Q    Directing your attention to the time when you were in the house with [Ms. Crider], [the defendant] had already left, am I right that [Ms. Crider] -- you overheard [Ms. Crider] call someone that you believed to be her mother; is that right?

A    Yes.

Q    And you overheard her telling her mother there had been a fight, that she had been hit, and that she needed an ambulance; is that right?

A    Yes.

Q    And you could see her, you could tell she had not been injured and did not need an ambulance, and you orally said -- with the hope that the person on the other end of the line could hear, you said, "No, that's not true, ma'am"?

A    I did.

The court did not alter its ruling in light of the offer of proof.

The defendant argues that because Ms. Crider's statement that the defendant had hurt her was not offered for its truth, it was not hearsay. Although it is true that the statement was not hearsay, it was also not relevant. That Ms. Crider told Ms. Jones that the defendant had hurt her did not make any fact of consequence more or less probable. The defendant claims that it was relevant to show Ms. Crider's "attitude and emotional state," but other, more competent evidence clearly established Ms. Crider's demeanor that morning. In any event, even if the evidence was marginally relevant, its exclusion was harmless given its minimal probative value.

### D.  Prior Consistent Statements by Ms. Knighton

During his case-in-chief, the defendant called Investigator Tim Riddle and attempted to ask him about some statements made during his lengthy interview with Ms. Knighton that were consistent with her direct examination testimony to rehabilitate her credibility generally, which he argued had been "destroyed" on cross-examination. The State objected, arguing that it had "attacked her on the issue of bleach, and the issue of not knowing" who the defendant's mother was and that the defendant should not be permitted to offer prior consistent statements on any issue other than those two. The trial court concluded that Ms. Knighton's credibility was not "seriously attacked on this issue" and

found that the proffered statement was not "a proper consistent statement on that part." The court found that the defendant could offer a prior consistent statement "about the bleach being there."

"Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted therein." *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citations omitted). "Although prior *inconsistent* statements of a witness may be admissible for impeachment purposes, the general rule, subject to certain exceptions, is that evidence of prior *consistent* statements may not be used to rehabilitate the impeached witness." *Id.* (citations omitted) (emphasis added). Three exceptions to the general rule exist, but the defendant relies on only one. Under that exception, when "the witness'[s] testimony [has] been assailed or seriously questioned to the extent that the witness'[s] credibility needs shoring up," the witness's prior consistent statement "may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." *State v. Benton*, 759 S.W.2d 427, 434 (Tenn. Crim. App. 1988). The defendant contends that Ms. Knighton's statement to Investigator Riddle that she overheard Ms. Crider insinuate that she had given the defendant a sexually transmitted disease was admissible to shore up her credibility because "[t]he State cross-examined Ms. Knighton regarding her credibility, and even directly accused her of lying."

Although it is true that the State cross-examined Ms. Knighton regarding her credibility, it did not do so in a manner that exceeded that which occurs every time a witness for the opposing party is cross examined. The only insinuations of fabrication or allegations of deliberate falsehood related to Ms. Knighton's direct examination testimony that she observed clothing on the defendant's bed that had been doused with bleach and that she had gathered the clothing into a plastic garbage bag in the very brief interval between the defendant's departure and the arrival of the police and then placed it on her back porch, never to be mentioned again. The State pointed out that even after hours of questioning by Investigator Riddle, Ms. Knighton made no mention of the bleached clothing that could, at that very time, have been located by officers on her porch. The State did not challenge her testimony on grounds that she had fabricated the claim of sexually transmitted disease. That Ms. Knighton's statement to Investigator Riddle on the issue of Ms. Crider's sexually transmitted disease was consistent with her trial testimony *on that issue* had no bearing at all on the issue of the bleached clothing. Stated another way, the impeachment of a witness on one issue does not render admissible every prior consistent statement the witness made in the case. To hold otherwise would make a mockery of the general rule excluding prior consistent statements. To the extent that it is not clear from the case law, we specifically hold that a witness's prior consistent statement about a particular issue may be admissible to rehabilitate the witness when the witness's testimony

-23-

about that same issue has been attacked, impeached, or branded with the mark of recent fabrication. General attacks on the witness' credibility do not open the door to the admission of all the witness's statements that happen to be consistent with the witness's trial testimony.

### III. Sonogram

The defendant asserts that the trial court erred by admitting into evidence a sonogram image of Ms. Crider's unborn child. The State contends that the trial court did not err.

The defendant was charged with the second degree murder of Ms. Crider's unborn child under the terms of Code section 39-13-214, which provides that, "[f]or the purposes of this part, 'another' and 'another person' include a human embryo or fetus at any stage of gestation in utero, when any such term refers to the victim of any act made criminal by this part." T.C.A. § 39-13-214(a). Tennessee Code Annotated section 40-38-103 provides that, "[i]n a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney general to show the general appearance and condition of the victim while alive." T.C.A. § 40-38-103(c). Here, the State offered a sonogram image taken of Ms. Crider's fetus during a doctor's appointment the week before the offenses. Ms. Jones, who had attended the appointment where the image was taken, verified its authenticity. In our view, the image was relevant and admissible to satisfy the State's burden of proving that the defendant knowingly killed "another." *See* T.C.A. § 39-13-210(a).

### IV. Mistrial

The defendant contends that the trial court erred by denying his motion for a mistrial, presented after Investigator Riddle spontaneously offered clearly inadmissible testimony during direct examination. The State asserts that the trial court did not err.

Prior to trial, the defendant moved the trial court to exclude evidence collected during the investigation that suggested that the defendant might have been engaged in the illegal drug trade and evidence that the defendant had committed or been charged with any other crimes not related to those at issue in this case. The trial court granted the motion. Despite the court's earlier ruling, during his direct examination testimony Investigator Riddle, while detailing the process he used to identify and apprehend the defendant, stated that after confirming the defendant's identity, he "went and took out the warrants for [the defendant] and placed them on file, and then I realized he had two other warrants pending as well." The defendant objected and moved for a mistrial, noting the court's earlier ruling. The trial court agreed that Investigator Riddle's

statement was not only "not responsive to the question" he had been asked but was also "clearly in violation of the [c]ourt's order." The court further observed that the statement was "the kind of thing too that in any trial that would never come in, or very, very rarely come in. So I don't understand why the investigator felt the need to throw that out there." The court concluded, however, that the danger for unfair prejudice was somewhat mitigated by the fact that the investigator had not specified "the nature of the warrants." The court declined to grant a mistrial but agreed to provide a curative instruction to the jury. The trial court also admonished the State to "be really careful from here on out, 'cause if it happens again, I'm probably going to grant that motion, and there will not be a third trial."

We find no abuse of discretion in the trial court's decision to deny the defendant's motion for mistrial. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Investigator Riddle's statement that the defendant had two other warrants pending was fleeting, and the defendant's objection cut the testimony short. Moreover, the remark was not made in response to any improper questioning by the State, and the State made no attempt to exploit the improper comment. Additionally, the trial court issued a curative instruction admonishing the jury to disregard "any reference to warrants." Finally, the court admonished the State to warn its witness that any further testimony offered in contravention of the court's earlier ruling would likely result in the court's granting a mistrial and dismissing the case. Under these circumstances, nothing indicated a manifest necessity for the declaration of a mistrial, and the trial court's decision to deny the motion did not result in a miscarriage of justice. *See Saylor*, 117 S.W.3d at 250.

## *V. Closing Argument*

The defendant asserts that the prosecutor made inappropriate comments during closing argument. Specifically, he argues that the prosecutor committed misconduct by inflaming and confusing the jury by calling the defendant a predator, by offering his "expert opinion" about the inferences to be drawn from the location of the shell casings, by stating "medical information that was not in the record," and by "repeatedly misstat[ing] the relevant legal question."

-25-

The prosecutor began his rebuttal with the following remarks:

> "Who do you think you're fooling? "Do you take me for a fool?" I told you in voir dire that's the kind of juror that I wanted, jurors that would sit there with common sense, and this is a case about common sense. And everything they just argued lacks sense when you think about what happened in this case. This was a case of a gun-toting, poison-peddling, dope-dealing Brandon Donaldson acting like a predator on Porter Avenue.

The defendant objected to the prosecutor's characterization of the defendant, but the trial court overruled the objection. The prosecutor immediately repeated the characterization: "Gun-toting, poison-peddling, dope-dealing Brandon Donaldson acting like a predator in the manner in which . . . he fired into that car." The defendant objected again, and the trial court sustained "the objection to 'acting like a predator.' Disregard the 'acting like a predator.'"

The prosecutor continued:

> You saw actually three different planes of that car getting -- getting hit. You saw one coming into the back window with a downward trajectory, right. Where was the shooter then? The shooter had to have been above the car. The shooter had to have been up on the lawn. The second set of shots are going into the trunk, straight away. You see the angles as it goes around the car, finally making it to the driver's side of the car, right? The shots as they go into the car are moving around the back of the car, and look at all the shell casings all the way up the street. He's chasing that car.

The defendant objected, arguing that there had been "no testimony to this." The trial court overruled the objection but instructed the jury to "disregard if they don't believe the evidence supports the argument." The prosecutor went on to argue that the placement of the shell casings showed that the defendant was "out in the street, going up the street chasing that car, and he wants you to come in here, and say, 'Well, give me a lesser-included offense. I was acting -- I was in a state of passion.' No. You were intending to kill those people. You shot 11 times."

Later, the prosecutor argued that Ms. Knighton's testimony was a "complete exaggeration of his -- of conduct" and asserted that Ms. Knighton "was making that up" when she said Ms. Crider had doused the defendant's clothes with bleach. He later proclaimed that Ms. Knighton "lied to you" when she said the defendant had picked Ms. Crider up "like a groom carries a bride." He also argued:

> And they can't even get the -- can't even get the venereal disease right, right? You heard Angelia Knighton, she said, "You sick dick, MFer, that's why your dick is burning, and I got a shot, took care of myself," right? Heard her say that. That was the provocative words that she said to him. And then he takes the stand and says something about herpes. You don't get a shot for herpes.

The defendant objected, and the trial court sustained the objection, ruling, "Yeah, if it's outside the scope of the evidence, folks, you may disregard the argument." Instead of moving on, the prosecutor immediately told the jury that "in your own everyday experience you could know what those two things mean and how they're disconnected." The defendant objected, and the trial court again sustained the objection.

The prosecutor later told the jury that it would "have to consider state of passion, at least for [Ms. Crider's] count," and the defendant objected. The trial court sustained the objection and noted that "that instruction applies to all alleged victims."

As to what might constitute adequate provocation, the prosecutor stated, "Folks, manslaughter and heat of passion is when you find somebody messing with your kid." The defendant objected, and the trial court overruled the objection. The prosecutor continued:

> Manslaughter, making a reasonable person act in an irrational manner is when you walk in, you see somebody messing sexually with your kid, and you go off; or you walk in and you find your spouse in bed with somebody else, and you go off. That's when reasonable persons would act irrationally.

"While the scope and depth of closing argument is generally a matter within the trial court's discretion, the State is not free to do what they wish," *State v. Jones*, 568 S.W.3d 101, 145 (Tenn. 2019) (citation omitted), and judges must take care to restrict improper argument, *see State v. Hill*, 333 S.W.3d 106, 130-31 (Tenn. Crim. App. 2010) (citation omitted). Because of the State's unique role in a criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its

-27-

commentary to matters in evidence or issues at trial." *Hill*, 333 S.W.3d at 131. Our supreme court

> has recognized five general areas of potential prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge.

*Jones*, 568 S.W.3d at 145 (citing *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)).

The prosecutor's rebuttal argument clearly violated three and, arguably, all five of the categories listed above. He began by arguing that everything defense counsel had argued "lacks sense." "The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007) (citing *Dupree v. State*, 410 S.W.2d 890, 892 (Tenn. 1967); *Moore v. State*, 17 S.W.2d 30, 35 (Tenn. 1929); *Watkins v. State*, 203 S.W. 344, 346 (Tenn. 1918); *McCracken v. State*, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972)). He improperly expressed his opinion that Ms. Knighton had "lied to" the jury. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *see also State v. Hall*, 976 S.W.2d 121 (Tenn. 1998); *State v. Henley*, 774 S.W.2d 908, 911 (Tenn. 1989). He improperly inflamed or attempted to inflame the passions of the jury by referring to the defendant as a "gun-toting, poison-pedaling, dope-dealing" predator, and argued facts outside the record by stating that a herpes infection would not have been treated by "a shot." He arguably injected broader issues than the defendant's guilt of the charged offenses by repeatedly referring to the fact that the defendant was dealing drugs at the time of the offenses We do not agree that the prosecutor intentionally misstated the applicable law. He did, however, come close to mischaracterizing the inferences to be drawn from the location of the shell casings. We are particularly concerned with the prosecutor's insistence on referring to the defendant as a predator. The courts of this state have repeatedly held that referring to the defendant as a predator is improper. *See Curtis Keller v. State*, No. W2020-00590-CCA-R3-PC, 2021 WL 2886338, at *10 (Tenn. Crim. App., Jackson, July 9, 2021) (providing examples of such cases). Indeed, the State should refrain from calling names. We are also concerned about the prosecutor's insistence on referring to the defendant as a "poison-peddl[er]" and "dope-deal[er]" because the defendant's alleged drug dealing, the only evidence of which came from the defendant's own

testimony, was completely irrelevant to the issues presented at trial. We can only surmise that the prosecutor was particularly enamored of the sound of that phrase since he uttered it twice. The most concerning thing about the comments is that they were not only improper, designed to invite the jury to convict the defendant on a basis other than his guilt of the offenses on trial, they were wholly unnecessary. As we will discuss more fully below, the proof of the defendant's guilt was overwhelming. Because the evidence was overwhelming, we cannot fathom why a veteran prosecutor would jeopardize the validity of a second trial by calling the defendant names and providing other obviously improper commentary during closing argument.

Even inappropriate closing argument, however, will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict. *See Hill*, 333 S.W.2d at 131 (citation omitted); *see also Jones*, 568 S.W.3d at 145 ("In other words, [improper argument] will be reversible error if the improper comments of the prosecutor were so improper or the argument so inflammatory that it affected the verdict."). An appellate court considering the harmful effect of improper closing argument examines the following factors:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
>
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
>
> (3) [t]he intent of the prosecutor in making the improper statements[;]
>
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record[; and]
>
> (5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Here, the defendant objected to each of the challenged comments, and the trial court sustained many of the objections. The court specifically instructed the jury to disregard the characterization of the defendant as a predator and any fact or inference argued that was not supported by the evidence. Additionally, as indicated, the evidence of the defendant's guilt was overwhelming. Although it is a close question, we cannot say that the prosecutor's argument was so inflammatory or improper that it affected the verdict.

*VI. Jury Instructions*

The defendant challenges the jury instructions relative to the offenses of second degree murder and voluntary manslaughter and the interplay between the two. He argues that the trial court's definition of the offense of voluntary manslaughter was legally incorrect because it improperly placed the burden on the State to prove beyond a reasonable doubt that the killing was done in a state of passion produced by adequate provocation. He also argues that because both second degree murder and voluntary manslaughter share a "knowing" mens rea, the acquittal-first jury instruction essentially precluded the jury's considering the lesser included offense of voluntary manslaughter. The State contends that the jury instructions were proper.

Because the constitutional right to trial by jury encompasses the right to a correct and complete charge of the law, the trial court's failure to fulfill its duty to give a complete charge of the law applicable to the facts of a case deprives the defendant of the constitutional right to a jury trial. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The trial court must provide all instructions properly raised by the proof, regardless of the instructions requested by either party. *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). To evaluate a claim of error in the jury charge, this court reviews the charge in its entirety. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A.§ 39-13-210(a). "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a).

Immediately after defining the offense of second degree murder, the trial court instructed the jury as follows:

> The distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by

adequate provocation from the alleged victim sufficient to lead a reasonable person to act in an irrational manner. You must consider this distinction when deciding whether or not the state has proven second-degree murder beyond a reasonable doubt.

The court then instructed the jury:

> If you have a reasonable doubt as to the defendant's guilt of second-degree murder as charged in the first and/or second counts, then your verdict must be not guilty as to that offense or offenses, and then you shall proceed to determine his guilt or innocence of voluntary manslaughter, a lesser-included offense of the first and second counts.
>
> Any person who commits voluntary manslaughter is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant unlawfully killed the alleged victim.
>
> . . . .
>
> (2) the defendant acted intentionally or knowingly; and
>
> (3) that the killing resulted from a state of passion produced from the alleged victim sufficient to lead a reasonable person to act in an irrational manner.
>
> Again, the distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation from the alleged victim sufficient to lead a reasonable person to act in an irrational manner.

The court also instructed the jury:

> Order of consideration.

In reaching your verdict, you shall first consider the offense charged in the presentment. If you unanimously find the defendant guilty of that offense beyond a reasonable doubt, you shall return a verdict of guilty for that offense. If you unanimously find the defendant not guilty of that offense, or have a reasonable doubt of the defendant's guilt of that offense, you shall then proceed to consider whether or not the defendant is guilty of the next lesser-included offense in order from greatest to least within that count of the indictment.

You shall not proceed to consider any lesser-included offense until you have first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense or you unanimously have a reasonable doubt of the defendant's guilt of that offense.

*A. Ms. Crider's Unborn Child*

As an initial matter, we address specifically voluntary manslaughter as a lesser included offense of the second degree murder of Ms. Crider's unborn child. Prior to trial, the defendant moved the trial court to instruct the jury on voluntary manslaughter as a lesser included offense of the second degree murder of Ms. Crider's unborn child. In a memorandum in support of his motion, the defendant acknowledged that some cases from this court appeared to indicate that an instruction on voluntary manslaughter was appropriate only when the victim of the homicide furnished the provocation but asserted that "a close examination of the authorities" demonstrated no such bright-line rule. Ultimately, the trial court agreed to provide the instruction. Although neither party has challenged this ruling on appeal, we must examine the issue because, if the defendant could not have been convicted of voluntary manslaughter as a lesser included offense of the second degree murder of Ms. Crider's unborn child, then any error in the trial court's instructions on voluntary manslaughter would necessarily be harmless beyond a reasonable doubt with regard to that count.

In *State v. Tilson*, our supreme court, considering the common law version of voluntary manslaughter, concluded that this court had erred by reducing a conviction to voluntary manslaughter when someone other than the victim provided the provocation. *State v. Tilson*, 503 S.W.2d 921, 924 (Tenn. 1974). The court was particularly concerned that to hold otherwise would permit a conviction of voluntary manslaughter for the death of "a noncombatant by-stander, provided either by association or friendship, or both, with the other combatant, the by-stander could be characterized as 'on the side' of the one

actually provoking the fight." *Id.* Later, in *State v. Brown*, the high court concluded that the defendant was not entitled to a jury instruction on voluntary manslaughter for the death of his young son because "it is a virtual legal impossibility for a small child to commit an act that would amount to provocation sufficient to make his subsequent death voluntary manslaughter rather than murder." *State v. Brown*, 836 S.W.2d 530, 554 (Tenn. 1992), *overruled on other grounds by State v. Reynolds*, 635 S.W.3d 893, 917 (Tenn. 2021). The ruling in *Brown* specifically overruled an earlier ruling of this court that had affirmed a conviction of voluntary manslaughter for a mother who had beaten her young child to death. *Capps v. State*, 478 S.W.2d 905, 907 (Tenn. Crim. App. 1972), *overruled by Brown*, 836 S.W.2d at 554. Contrary to the defendant's assertions in the trial court, neither of these well-settled principles has been overruled.

The defendant argued that the law of the case doctrine required an instruction on voluntary manslaughter because this court's ruling in his previous appeal vacating both convictions of second degree murder and remanding the case for a new trial implicitly included a ruling that voluntary manslaughter would be an appropriate verdict for the death of Ms. Crider's unborn child. We reversed the defendant's convictions, however, because the trial court improperly excluded evidence that touched on all of the charged offenses and impacted the trial as a whole. Our ruling was not one on the legal sufficiency of a verdict of voluntary manslaughter for the unborn child. Moreover, because jury instructions depend entirely on the facts elucidated at trial, even if our prior ruling could be construed has having touched on the propriety of a voluntary manslaughter instruction in the prior trial, it would not necessarily mandate such an instruction upon retrial. Had we intended to make such a ruling, we would have done so. Because it was impossible for the unborn child to have committed an act sufficient to provoke his death, an instruction on voluntary manslaughter as a lesser included offense of the second degree murder of the unborn child was not warranted, and any error in the one provided at trial would be harmless beyond a reasonable doubt.

## B. Ms. Crider

We turn, then, to the propriety of the jury instructions as to the death of Ms. Crider.

In his first direct appeal, the defendant challenged the propriety of the trial court's instructions on second degree murder and voluntary manslaughter, arguing much as he does here "that the trial court erroneously instructed the jury that a 'state of passion' was an element of voluntary manslaughter rather than a defense and that the trial court erred by its use of sequential jury instructions." *Brandon Scott Donaldson*, slip op. at 18. In that opinion, this author expressed the view that "the references to passion and provocation by their very nature express neither elements of voluntary manslaughter that

-33-

the State is required to prove nor an absolute defense; instead, they are a type of built-in mitigation to a knowing or intentional killing." *Id.*, slip op. at 20. Instructing the jury that a state of passion produced by adequate provocation are elements to be proved by the State combined with the use of the acquittal-first instruction "creates a conundrum." *Id.* This author expressed the view that "the notion that passion and provocation in the manslaughter statute are essential elements of that offense is analytically unsound" and that "[r]equiring the State to prove what is essentially an exculpatory circumstance is akin to a house divided unto itself." *Id.*, slip op at 24.

Confusion about the passion/provocation construct has emanated from *State v. Williams*, 38 S.W.3d 532 (Tenn. 2001). There, our supreme court considered the issue "whether the doctrine of mutual combat remain[ed] viable" following the 1989 amendment to the homicide statutes. *State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001). In *Williams*, the court observed that, at common law, "the essential element required to distinguish second (2nd) degree murder from voluntary manslaughter is the presence or absence of malice at the time of the killing." *Id.* at 536 (quoting *Wilson v. State*, 574 S.W.2d 52, 55 (Tenn. Crim. App. 1978)). The court then "[c]ompar[ed] the revised second degree murder and voluntary manslaughter statutes" and concluded that "the essential element that now distinguishes these two offenses (which are both 'knowing' killings) is whether the killing was committed 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" *Id.* at 538. This language has led any number of panels of this court to conclude that "a state of passion produced by adequate provocation" is an "essential element" of the offense of voluntary manslaughter. A close reading of *Williams*, a thorough examination of the history of homicide offenses in Tennessee, and the application of old-fashioned common sense, however, leads to the inevitable conclusion that the *Williams* court did not use the word "element" as it is generally understood in the criminal law but instead used it in its more common form, i.e., "a constituent part."

The threshold question is: Why does it matter whether the passion/provocation construct is deemed an element of voluntary manslaughter? It matters because treating passion/provocation as an element of the offense of voluntary manslaughter alters the quantum of proof necessary to warrant an instruction on that offense and impacts the evaluation of the sufficiency of the convicting evidence. An instruction on a lesser included offense is not warranted unless the trial court, viewing the evidence "liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence," "determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense" and that "the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense." T.C.A. § 40-18-110(a). On the other hand, the general standard for jury instructions provides that a particular instruction should be given

-34-

when "fairly raised" by the proof. *See, e.g.*, *Lester v. State*, 370 S.W.2d 405, 409 (1963) ("Of course, it is well settled that the accused was entitled to an affirmative instruction upon every issue raised by the evidence. This though does not require the court to instruct on matters not raised by the evidence."); *State v. Townes*, 56 S.W.3d 30, 36 (Tenn. Crim. App. 2000), *overruled on other grounds by State v. Terry*, 118 S.W.3d 355 (Tenn. 2003) ("The duty of the trial court to charge the jury arises when an issue is fairly raised by the evidence."); *see also, e.g.*, *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020), *cert. denied* 141 S. Ct. 427 (2020) (general defenses); *State v. Little*, 402 S.W.3d 202, 217 (Tenn. 2013) (criminal responsibility); *State v. Brown*, 823 S.W.2d 576, 585 (Tenn. Crim. App. 1991) (unanimity).

Understanding the historical framework is important. At common law, murder occurred "where a person of sound mind and discretion, unlawfully killeth any reasonable creature, in being, and under the king's peace, with malice aforethought either express or implied." *Fields v. State*, 9 Tenn. 156, 159 (1829) (citation omitted). This general definition of murder was adopted into our first official Code in 1858, where it remained, largely unchanged, until the 1989 amendment to the criminal code: "If any person of sound memory and discretion, unlawfully kill any reasonable creature in being, and under the peace of the state, with malice aforethought, either express or implied, such person shall be guilty of murder." T.C.A. § 39-2-201 (1982); *see also* T.C.A. § 39-2401 (1956); 1932 Code § 10767; Shannon's Code § 6438; 1858 Code § 4597. All forms of murder, or felonious homicide, were included in this definition unless adequate provocation existed to mitigate the offense to manslaughter, *Mitchell v. State*, 16 Tenn. (8 Yer.) 514, 530 (1835), which was defined at common law as "the unlawful killing of another, without malice either express or implied," *Fields*, 9 Tenn. at 159 (citation omitted). Prior to 1989, the Code "did not consider manslaughter, voluntary or involuntary, 'murder.'" *Issac Lydell Herron v. Fred Raney, Warden*, No. 02C01-9805-CC-00153, 1998 WL 725797, at *3 (Tenn. Crim. App., Jackson, Oct. 19, 1998). As a result of this structure, "once the homicide ha[d] been established, it [was] presumed to be murder in the second degree." *Brown*, 836 S.W.2d at 543, *superseded by statute on other grounds as stated in Reynolds*, 635 S.W.3d at 917 (citing *Witt v. State*, 46 Tenn. (6 Cold.) 5, 8 (1868)). For a time, under this structure, "[t]o reduce the degree of the homicide" the defendant was required to "prove an absence of malice, and a corresponding burden rest[ed] on the State to prove premeditation or some other ingredient to raise the degree of the homicide." *Shanklin v. State*, 491 S.W.2d 97, 99 (Tenn. Crim. App. 1972); *see also, e.g.*, *Mullaney v. Wilbur*, 421 U.S. 684, 694 (1975) (stating that "at common law the burden of proving heat of passion on sudden provocation appears to have rested on the defendant"); *Thomas v. State*, 358 S.W.2d 315, 316 (1962) ("The onus of showing circumstances which mitigate the crime from second degree murder to manslaughter or justified homicide is imposed upon the defendant."). In any event, "the presence or absence of the heat of passion on sudden provocation—has been, almost from the inception of the common law of homicide,

the single most important factor in determining the degree of culpability attaching to an unlawful homicide," and "the clear trend has been toward requiring the prosecution to bear the ultimate burden of proving this fact." *Mullaney*, 421 U.S. at 696 (citations omitted). Clearly, evidence that the killing resulted from passion produced by adequate provocation historically acted as a dispensation to the defendant, regardless of whether the burden of establishing its existence shifted over time.

The 1989 Code, however, redefined "criminal homicide" as "the unlawful killing of another person, which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide or vehicular homicide." T.C.A. § 39-13-201 (1989). The *Williams* court was tasked with determining the continued existence of the mutual combat doctrine, which developed alongside the offense of voluntary manslaughter, in light of the 1989 amendments to the homicide statutes. The court found that "mutual combat did not, as a matter of law, reduce second degree murder convictions to voluntary manslaughter" but instead provided a framework "to determine whether the killing resulted from provocation sufficient to *negate the existence of malice*." *Williams*, 38 S.W.3d at 537 (emphasis added). The court observed "that evidence of the confrontation between the defendant and the victim sufficiently proved that the killing occurred as a result of provocation or the 'heat of passion,' thus negating the element of malice necessary to support a conviction for second degree murder." *Id.* at 538. The court then concluded that "[b]ecause 'malice aforethought' is no longer an element of second degree murder, it is now inaccurate to state that the element of malice is the essential distinction between second degree murder and manslaughter" and that, instead "the essential element that now distinguishes these two offenses (which are both "knowing" killings) is whether the killing was committed 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" *Id.* The court held that the consequence of its holding was "simply that *the defendant* may contend that the particular facts concerning the homicide, including proof of mutual combat, warrant a finding that the killing was the result of 'adequate provocation,' thereby constituting voluntary manslaughter." *Id.* at 539. This language demonstrates that "the passion/provocation formulation" is best treated "not as a true element of the proscribed offense to be established by the State but rather as a dispensational defense to a defendant who committed an otherwise intentional or knowing killing." *State v. Khaliq Ra-El*, No. W2013-01130-CCA-R3-CD, 2014 WL 3511038, at *6 (Tenn. Crim. App., Jackson, July 11, 2014) (Witt, J., concurring in results only).

When placed in proper context, the holding in *Williams* cannot be understood to hold that passion induced by provocation became an essential element of the offense of voluntary manslaughter following the 1989 amendment because such treatment would have been a fundamental departure from the historical understanding of the offense. To hold that the *Williams* court intended to deem passion induced by adequate provocation an

essential element to be proven by the State is to say that the court intended to turn on its head the historical underpinning of the offense of voluntary manslaughter by way of a single sentence unaccompanied by any analysis of the historical treatment of evidence of passion induced by provocation.

Additionally, such treatment necessarily leads to absurd results. When passion induced by provocation is treated as an essential element of voluntary manslaughter, a reviewing court has no choice but to reverse a conviction for voluntary manslaughter where the State has clearly established a "knowing killing" but failed to establish that the killing was committed "in a state of passion produced by adequate provocation." *See State v. Lumpkin*, No. M2019-01912-CCA-R3-CD, 2020 WL 7682239, at *6 (Tenn. Crim. App., Nashville, Dec. 23, 2020), *perm. app. denied* (Tenn. Apr. 7, 2021); *see also, e.g.*, *State v. Edward Joseph Benesch*, No. M2015-02124-CCA-R3-CD, 2017 WL 3670196, at *18 (Tenn. Crim. App., Nashville, Aug. 25, 2017) (reversing defendant's conviction of voluntary manslaughter "because no rational trier of fact could have found that the [victim's] behavior, normal for a child her age, constituted 'adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'"). In *Lumpkin*, a panel of this court reversed a conviction of voluntary manslaughter after finding that although the evidence adduced at Lumpkin's trial overwhelmingly supported a conviction of "either felony murder or second degree murder," "[n]o evidence, direct or circumstantial, was introduced at trial to support a conclusion that the perpetrator who shot the victim in the head acted in a state of 'passion,' produced by 'adequate provocation,' which was legally sufficient to cause a reasonable person to act in an irrational manner." *Id.* Given the dearth of evidence that Lumpkin acted in a state of passion produced by adequate provocation, this court modified his conviction to one of reckless homicide. Of course the State presented no proof to support a conclusion that Lumpkin acted in a state of passion produced by adequate provocation. Why would it ever do so when it has charged the defendant with first degree murder? And what of evidence of passion and provocation presented by the defendant? Where does consideration of this evidence fall when the burden lies with the State to present evidence to support those "elements" beyond a reasonable doubt? "One of the accepted rules of statutory interpretation is that courts must presume that the legislature in enacting the provision in question did not intend an absurdity, and that such a result must be avoided, if possible, by reasonable construction of the statute." *State v. Harrison*, 692 S.W.2d 29, 31 (Tenn. Crim. App. 1985).

One need only conduct a brief survey of the plethora of cases on this issue after *Williams* to understand that the law is not nearly well-settled. We would ask, as other panels have done since as early as 2004, that our supreme court address this issue.

The problem occasioned by treating passion induced by provocation as an element that must be proved by the State is compounded by the acquittal-first jury

instruction, which, completely appropriate in nearly every other situation, acts as a practical barrier to the jury's consideration of voluntary manslaughter as a lesser included offense of first or second degree murder. Once the jury finds that the defendant has committed a knowing killing, it *cannot* move on to consider voluntary manslaughter as a lesser included offense if it follows the pattern jury instruction. Moreover, the additional instruction to the jury that it should consider the difference between the two offenses does little to break down this barrier given that it does not actually guide the jury's consideration. Additionally, that instruction is sandwiched between two others that specifically prohibit consideration of the offense of voluntary manslaughter before the jury has decided on the offense of second degree murder.

All that being said, however, we find that any error occasioned by the jury instructions in this case was harmless beyond a reasonable doubt. "When an appellate court undertakes a harmless error analysis its purpose is to ascertain the actual basis for the jury's verdict . . . , [t]he crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008). Here, the evidence clearly supported a conclusion that the defendant knowingly killed Ms. Crider and her unborn child. No evidence, presented by either the State or the defendant, supported a conclusion that he acted "in a state of passion *produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner*." T.C.A. § 39-13-211 (emphasis added). The evidence established that the defendant and Ms. Crider argued and that she said provocative things to the defendant. "[G]enerally, 'the law regards no mere epithet or language, however violent or offensive, as sufficient provocation for taking [a] life.'" *State v. Gary E. Floyd*, No. M2017-00272-CCA-R3-CD, 2018 WL 1560079, at *9 (Tenn. Crim. App., Nashville, Mar. 29, 2018), *perm. app. denied* (Tenn. July 18, 2018) (quoting *Freddo v. State*, 155 S.W. 170, 172 (Tenn. 1913)); *see also State v. Christopher Michael Ferrell*, No. M2015-01011-CCA-R3-CD, 2016 WL 6819784, at *14 (Tenn. Crim. App., Nashville, Nov. 18, 2016) (observing that "the verbal altercation between the victim and the [d]efendant and the victim's threats to kill the [d]efendant, standing alone, could not provide 'sufficient provocation for taking [a] life.'"). Ms. Crider was not armed, and she did not overtly threaten the defendant's life. Certainly none of Ms. Crider's provocative statements or behavior, even construed in the light most favorable to the defendant, was so provocative as to lead a reasonable person to run into the street and fire 11 times at a car carrying a woman, her mother, and her unborn child. Accordingly, the defendant is not entitled to relief on this issue.

## VII. Sufficiency

The defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to establish that he acted knowingly. The State asserts that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-106(23).

The evidence adduced at trial, examined in the light most favorable to the State, established that the defendant and Ms. Crider argued on February 13, 2013. During their argument, Ms. Crider hurled any number of nasty insults at the defendant and even suggested that he had given her a sexually transmitted disease. Ms. Jones went to pick Ms. Crider up, and Ms. Crider hurled one last insult at the defendant as she left, telling him that she had poured Sprite into his shoes. Instead of simply allowing Ms. Crider to leave and the situation to deescalate, the defendant went first into his room and then followed Ms. Jones and Ms. Crider outside. He fired at Ms. Jones' car 11 times as she drove away, striking Ms. Crider twice in the back, killing her and her unborn child. In our view, this evidence was more than sufficient to support the defendant's convictions of second degree murder.

*VIII. Sentencing*

The defendant contends that the trial court erred by imposing sentences of 25 years, the maximum within the range, for each of the defendant's convictions and by aligning the sentences consecutively, there by "essentially ensuring that the defendant will never be released." The State contends that the trial court did not err.

At the August 2018 sentencing hearing, the trial court found that enhancement factors 1, that the defendant had a history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range; 3, that the offense involved more than one victim; 4, that a victim was particularly vulnerable because of age;

8, that the defendant had previously failed to comply with the conditions of a sentence involving release into the community; 9, that the defendant employed a firearm during the commission of the offense; 10, that the defendant had no hesitation about committing a crime when the risk to human life was high; and 13, that the offense was committed while the defendant was on probation, applied to both of the defendant's convictions. The court gave great weight to factors 1, 9, and 10; "a little less" weight to factors 8 and 13; and "probably not much" weight "at all" to factors 3 and 4. The trial court found that neither mitigating factor 2, that the defendant acted under strong provocation, nor mitigating factor 3, that substantial grounds existed tending to excuse or justify the defendant's conduct, applied, explaining

> I just don't think this is a case of strong provocation. The jury rejected the voluntary manslaughter argument, but beyond that it's not what I would call strong provocation. People do things like Ms. Crider was doing and saying that day all the time, and it's certainly not grounds or even an excuse to engage in the conduct that [the defendant] did, and I don't think that it was what I would consider strong provocation. May have been some provocation to say something back to her, maybe even throw a rock at the car, but certainly not to fire repeatedly into a moving vehicle that contained three individuals . . . .

The court also concluded that mitigating factor 6, that the 22-year-old defendant lacked judgment because of his youth, did not apply, finding, "I certainly think at his age [the defendant] knew that you don't shoot into a carload of people. He had been convicted of a felony offense already and was on probation where he certainly should have seen that there are consequences for criminal behavior in those actions." The court did consider the defendant's youth under the catch-all provision in mitigating factor 13. Finally, the court refused to apply mitigating factor 11, that the offense was committed under such unusual circumstances that it was not motivated by a sustained intent to violate the law, concluding that it did not "see unusual circumstances here. People argue and get in fusses all the time and say really bad things and do bad things to people, but that's not an unusual circumstance that in anyway I think would lead somebody to engage in this behavior."

> The court found that the weight of the mitigating factors did not "come[] close to outweighing the enhancement factors" and "that a sentence near the top of the range is appropriate." The court imposed sentences of 25 years for each of the defendant's convictions.

As to sentence alignment, the court determined that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The court observed that the defendant had no hesitation about committing an offense that not only resulted in the deaths of Ms. Crider and her unborn child but also endangered the lives of Ms. Jones and others in the nearby area. The court noted that the defendant "came out with a gun" and fired 11 times. In describing the circumstances of the offenses as "aggravated," the trial court found that the age of Ms. Crider's unborn child "increases the aggravation" and "that there was absolutely no justification whatsoever, regardless of what she did to his property or what she said to him." The court added that there was "no justification whatsoever about committing this offense where you have somebody who's been on probation, a convicted felon, knows they can't have a gun, and then takes this gun and just opens fire with quite a bit of accuracy." The court concluded that the circumstances of the offenses coupled with the fact that the defendant "was dealing drugs" indicated that "confinement for an extended period of time is, in fact, necessary to protect society from that further conduct." Finally, the court explained why it believed that an aggregate sentence of 50 years was the least severe sentence appropriate to accomplish the purposes of sentencing "and to administer justice":

> [T]here's really three principles that I follow.
>
> First is be merciful when justice can still be obtained by granting mercy, 'cause sometimes granting mercy thwarts the ends of justice. And so if you can grant mercy and still achieve justice, you should still do it.
>
> Second is be as merciful as possible and still achieve that justice, and our laws support that. . . . . Give the least sentence that is possible.
>
> And then the last one is to err on the side of mercy. When in doubt, the [c]ourt should grant mercy when they can. That's why we have presumption of innocence, and lots of other laws that are designed to be sure that we're a merciful society.
>
> And so when I weigh these things and come down to whether or not the aggregate length of sentences reasonably relate to the offense for which the defendant stands convicted, I do not -- I do not have that struggle in my mind on whether or not granting mercy in the form of a lower sentence would

achieve justice. To me, in my mind, after considering all these factors, the circumstances of this case, I believe justice is served by consecutive sentences.

The court ordered the defendant to serve the 25-year sentences consecutively to one another, for a total effective sentence of 50 years' incarceration, to be served at 100 percent by operation of law.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). In *State v. Wilkerson*, the supreme court held that the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct before utilizing the "dangerous offender" category to impose consecutive sentencing, *see State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995), and "[t]he adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement," *Pollard*, 432 S.W.3d at 863.

In our view, the trial court did not abuse its discretion by imposing an aggregate sentence of 50 years. The defendant does not argue that the trial court misapplied the enhancement or mitigating factors and does not contend that the trial court failed to comply with *Wilkerson*. Instead he asks this court to second guess the trial court's conclusion, arguing that "the severity of the tragedy does not require imposition of the harshest possible sentence." Our standard of review does not permit us the luxury of simply

-42-

reconsidering the sentencing decision of the trial court when the record indicates that it was imposed in compliance with statutory sentencing principles. Moreover, even if it did, we would find that, upon re-examination, the trial court's thorough and well-reasoned sentencing decision was fully supported by the record.

## IX. Cumulative Error

Finally, the defendant asserts that the cumulative effect of the errors at trial deprived him of the right to a fair trial. Although both the state and federal constitutions protect "a criminal defendant's right to a fair trial," neither guarantees "a perfect trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)). Protecting the right to a fair trial "drives the existence of and application of the cumulative error doctrine in the context of criminal proceedings," but "circumstances warranting the application of the cumulative error doctrine to reverse a conviction or sentence remain rare." *Hester*, 324 S.W.3d at 76 (citations omitted). Although we allow that with respect to some issues error was committed, we have determined that any errors were harmless in light of the overwhelming evidence of the defendant's guilt and, consequently, "do not lend themselves to being aggregated to show that he failed to receive a fair trial." *State v. Hester*, 324 S.W.3d at 77. "The line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt." *State v. Carter*, 714 S.W.2d 241, 248 (Tenn. 1986).

## X. Conclusion

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE